

**CLERK, U.S. BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**

# ENTERED
THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

The following constitutes the ruling of the court and has the force and effect therein described.

**Signed December 5, 2022**

_____
**United States Bankruptcy Judge**

_____

**United States Bankruptcy Court**
**Northern District of Texas**
**Dallas Division**

| | | |
|---|---|---|
| In re: | § § | |
| Kandace Michelle Mikel, | § § § | Case No. 21-31206-swe-7 |
| Debtor. | § § § | |
| Jeremiah Mikel, | § § § | |
| Plaintiff, | § § | Adv. No. 21-3071-swe |
| v. | § § | |
| Kandace Michelle Mikel, | § § § | |
| Defendant. | § § | |

*Findings of fact and conclusions of law*

The matter before the Court is a malicious-prosecution and exception-to-discharge case involving an allegedly false report to the Ennis Police Department. In his complaint for exception to discharge of debts, Docket No. 1 (the "**Complaint**"), Jeremiah Mikel seeks a determination of the dischargeability of certain debts of Kandace Michelle Mikel, the debtor in the underlying Chapter 7 bankruptcy case. The following are the Court's findings of fact and conclusions of law, issued pursuant to Rule

1

52 of the Federal Rules of Civil Procedure, as made applicable in adversary proceedings by Federal Rule of Bankruptcy Procedure 7052.[1]

## I. Jurisdiction and Venue

This Court has subject matter jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 157 because it involves core matters under 28 U.S.C. § 157(b)(2)(A), (B), and (I). Venue for this adversary proceeding is proper pursuant to 28 U.S.C. § 1409(a).

## II. Background[2]

Kandace and Jeremiah Mikel were married from September 2016 to March 2020 and had one daughter together during the marriage. This dispute involves the events on the night of February 28, 2018. The couple had a date night. They went to dinner and a movie, during which both of them drank alcohol; Jeremiah drank the most. After the date, the couple picked up their one-year-old daughter and went home where argument ensued. Kandace called 911 and reported that Jeremiah threw a metal tumbler full of water at her while she held their daughter.

Jeremiah did throw the tumbler. But he says he tossed it at the nearby linen closet—not at Kandace. Two officers from the Ennis Police Department arrived at the scene where they discovered a visible wound on Kandace's right thigh in two distinct concentric abrasions—a larger, outer ring and a smaller, inner ring.

Kandace claims the injury resulted from Jeremiah throwing the metal tumbler, which had a lid with a hard, plastic straw attached, directly at her, striking her. Jeremiah maintains that he did not throw the tumbler at her and claims that the injury is wholly inconsistent with, and could not have been made by, throwing the tumbler—that is, the only possible cause of Kandace's injury is self-infliction.

The Mikels' marital problems did not begin that night. Indeed, their marital demise was already in the works, as Jeremiah had already filed

---

[1] Any finding of fact that more properly should be construed as a conclusion of law shall be considered as such, and *vice versa*.

[2] The facts are taken from the Joint Pretrial Order, Docket No. 59, and the evidence admitted at trial.

2

for divorce on February 21, 2018, but had not served Kandace as of their February 28 date night. Kandace claims that she did not know about the impending divorce. The evidence suggests the contrary, however—that she knew about the divorce filing, or at the very least knew that Jeremiah had hired a divorce attorney. Thus, Jeremiah claims that Kandace was motivated to bring false claims against him, as she was concerned about obtaining an advantage over him in an imminent child-custody dispute.

Based on Kandace's injury and her statement that Jeremiah threw the tumbler at her while she held their child, the police arrested Jeremiah that night and charged him with two offenses: (1) aggravated assault to a family member with a deadly weapon and (2) child endangerment. Jeremiah was released on bail of $15,000, which he posted via bond by paying $1,530. Jeremiah retained counsel to defend the charges against him.

In September 2018, the Ellis County District Attorney rejected the child-endangerment charge for prosecution. The District Attorney also reclassified the aggravated-assault charge to a lesser charge of assault causing bodily injury to a family member, a Class A Misdemeanor. The District Attorney ultimately dismissed the criminal actions against Jeremiah in January 2020, citing insufficient evidence to prosecute. Jeremiah spent $40,000 in legal fees and expenses defending the criminal charges against him.

In the couple's divorce proceeding,[3] the divorce court awarded Jeremiah $15,577.77 in attorney's fees in connection with Kandace's violation of the divorce court's temporary orders. Upon entering the final decree of divorce in May 2020 (the "**Final Divorce Decree**"), the divorce court, among other things, found that Kandace breached a mediated settlement and awarded Jeremiah damages of $29,601.67, plus pre and post-judgment interest. Pursuant to that Final Divorce Decree, Kandace also owes monthly child support.

Jeremiah filed suit in state court in June 2020, asserting various causes of action against Kandace, including malicious prosecution.[4] That court

---

[3] Case No. 97901D in the 378th District Court of Ellis County.

[4] Case No. 103635 in the 40th District Court of Ellis County.

awarded Jeremiah attorney's fees of $13,992 for Kandace's frivolous motion to dismiss, but the state court did not reach the merits of the lawsuit prior to Kandace's bankruptcy filing.

Kandace filed a voluntary Chapter 7 bankruptcy case on June 30, 2021 in this Court. Jeremiah then filed this adversary proceeding asserting five counts: (I) malicious prosecution, (II) exception to discharge of malicious prosecution under 11 U.S.C. § 523(a)(6),[5] (III) exception to discharge of a child-support obligation under 11 U.S.C. § 523(a)(5), (IV) exception to discharge of divorce attorney's fees obligation under 11 U.S.C. § 523(a)(15) or (a)(5), and (V) exception to discharge of divorce obligations under 11 U.S.C § 523(a)(15) or (a)(5). The parties resolved Counts III, IV, and V by stipulation, agreeing that the divorce court's award of $15,577.77 and the damages of $29,601.67 (plus pre and post-judgment interest) are nondischargeable under section 523(a)(5) or section 523(a)(15) and that the past-due child-support obligation of $1,814.41 is nondischargeable under section 523(a)(5). Trial commenced on Counts I and II on August 15 and concluded on August 16, 2022.

### III. Discussion

Section 523(a) of the Bankruptcy Code provides that a discharge under section 727 does not discharge an individual debtor from certain types of debt. The discharge provided by the Bankruptcy Code is meant to give honest debtors a financial "fresh start." *See Local Loan Co. v. Hunt*, 292 U.S. 234, 245 (1934); *In re Miller*, 156 F.3d 598, 602 (5th Cir. 1998). To achieve this "fresh-start" purpose, the discharge exceptions are to be narrowly construed in favor of the debtor. The privilege of discharge is for the "honest but unfortunate debtor." *Grogan v. Garner*, 498 U.S. 279, 286–87 (1991).

The party seeking to establish an exception to the discharge of a debt bears the burden of proving each element by a preponderance of the evidence. *Id.* at 291; *see also In re Eichelberger*, 12 F.3d 1097 (5th Cir. 1993) (confirming that the bankruptcy court is to employ a preponderance-of-the-evidence standard, rather than a clear-and-convincing-

---

[5] Jeremiah also asserted a claim for attorney's fees of $13,992 awarded in the state-court malicious-prosecution suit, but he abandoned that claim at trial.

4

evidence standard when considering a factual dispute in a nondischargeability action).

A.  **Count I: Malicious Prosecution**

Under Texas law, a plaintiff asserting a malicious-criminal-prosecution claim must show by a preponderance of the evidence that (1) a criminal prosecution was commenced against the plaintiff; (2) the defendant initiated or procured that prosecution; (3) the prosecution terminated in the plaintiff's favor; (4) the plaintiff was innocent of the charges; (5) the defendant lacked probable cause to initiate the prosecution; (6) the defendant acted with malice; and (7) the plaintiff suffered damages. *Kroger Tex. Ltd. P'ship v. Suberu*, 216 S.W.3d 788, 792, n.3 (Tex. 2006).

The Texas Supreme Court recognizes that those subjected unjustifiably to criminal proceedings have redress through a malicious-prosecution claim, but it has also made clear that the claim must sometimes yield to society's interest in encouraging citizens to report crimes, real or perceived. *Id.* at 792. Thus, the elements prescribed by the Texas Supreme Court are designed to balance these interests. *Id.* The Court must determine, therefore, by a preponderance of the evidence, whether Kandace, acting without probable cause and with malice, caused the commencement of a criminal prosecution against Jeremiah.

The parties do not dispute the first element—that a criminal prosecution was commenced against Jeremiah. The evidence also clearly establishes the third element—that the prosecution terminated in Jeremiah's favor, as the Ellis County District Attorney dismissed all the charges. Pl.'s Exs. 4, 5, 8. The parties dispute the remaining elements.

As the fact finder, the Court weighs the evidence presented at trial and determines the credibility of each witness. The credibility of the witnesses is especially important here in this he-said-versus-she-said situation.

Jeremiah's account of the events of that night is more credible. He admitted that he had been drinking during their date night and that he drank more than Kandace. Jeremiah testified that when he and Kandace returned from their date, they began to fight about where their child would sleep that night, and so he threw the tumbler out of frustration. When he threw the tumbler, Jeremiah stood in the hallway, which is about three-feet wide. Kandace, holding their daughter, stood down

5

the hallway in the doorway to a bedroom. He threw the tumbler in a downward direction, the lid and straw separated from the cup, the cup struck the nearby linen cabinet, splashing water on the wall, and the lid and straw slid toward Kandace's feet and came to rest approximately mid-way between them on the floor. Jeremiah picked up the cup, left the lid and straw, and went to the kitchen to fill the cup back up with water. Then, he heard Kandace call 911.

Kandace told 911 that Jeremiah threw the tumbler at her. Def.'s Ex. 1-1 at 1. Kandace told the responding officers that their child was sleeping in her arms when Jeremiah threw the tumbler at both of them, causing her injury. Def.'s Ex. 3-1 at 1. Pictures of Kandace's wound taken immediately after the incident show two perfectly, concentric inner and outer circular abrasions on Kandace's right thigh. Def.'s Ex. 10; Pl.'s Ex. 15. The circles match the underside of the lid with the straw inserted into the lid perfectly, as if it were impressed onto the skin with enough force to cause the skin to compress inside the cavities of the lid and straw, creating distinctive, deep abrasions.

In charging Jeremiah, the Police reasoned that the injury elevated the charges to a "different level." Def.'s Ex. 4-1 at 6. Based on Kandace's statement that Jeremiah threw the tumbler at her and the child, the Police initially told Kandace they could charge Jeremiah with assault. Def.'s Ex. 3-1 at 1. Upon assessing Kandace's injury, the police ultimately charged Jeremiah with felony assault with a deadly weapon and child endangerment. Def.'s Ex. 4-1 at 6–7.

The evidence shows that Kandace's injury could not have resulted from Jeremiah throwing the tumbler. Jeremiah's expert witness, John Laughlin, a biomechanical engineer, demonstrated the various configurations of the cup, lid, and straw that theoretically could cause Kandace's injury and the significant force necessary to inflict such an injury. Laughlin explained that this injury is in the form of an abrasion rather than a bruise, the former being a skin laceration caused by scraping, torsional force and the latter being a blunt-force wound resulting from pooling of the blood on the epidermis. Laughlin testified that if Kandace's wound were the result of Jeremiah throwing the tumbler at her, a bruise—rather than the distinct abrasions—would result. Laughlin analyzed the following four alternative configurations of the cup, lid, and straw and determined that none would cause concentric lacerations if thrown: (1) the cup with the lid and straw attached, (2) the cup with

6

the lid attached without the straw, (3) the cup with the straw and no lid, and (4) the lid with the straw and no cup. According to Laughlin, it is impossible to cause such a penetrative injury by throwing the tumbler; instead, this particular injury is associated with a torsional force accomplished by rubbing.

The Court carefully examined the tumbler, including its removable lid and hard, plastic straw. The top rim of the screw-on tumbler lid (where a person would sip from, if not using a straw) is smooth, flat, and relatively wide, with only a slightly raised bevel. By contrast, the underside of the tumbler lid (which is revealed only if the lid is unscrewed and removed from the tumbler) has a thin, sharp, plastic ring that matches the size of the outside ring wound on Kandace's leg.

Based on the pictures of the injury, the expert testimony, and the Court's examination of the tumbler (including lid and straw), the Court finds that such perfectly concentric abrasions could be accomplished only by rubbing the underside of the lid, together with the straw inserted through the lid's center hole, onto Kandace's skin with enough force to create abrasions. The top of the lid (which both parties agree was on the tumbler when thrown) could not possibly have created the outer-ring wound on Kandace's leg given its wide, smooth rim. Nor could the hard straw and the underside of the lid have made the inner-ring and outer-ring wounds merely from being thrown with the tumbler, even with excessive force and extreme precision.

With six minutes and forty-five seconds elapsing between the 911 call and when the police arrived, Kandace would have had plenty of time to inflict the injury on herself. Jeremiah had taken the cup, so all Kandace had left was the lid and straw. Kandace testified that she never put their child down and that she used her other hand to hold the phone to her ear. Jeremiah, on the other hand, said that Kandace had dialed 911 on speaker phone, and he was listening to the call in the other room. After considering the nature of the injury and weighing the credibility of Jeremiah and Kandace, the Court finds that the only possible explanation for this injury is that Kandace found the time and freed one or both of her hands to inflict this injury on herself, pushing and twisting both the underside of the tumbler lid and the hard, plastic straw into her leg.

In so finding, the Court examined the demeanor, tone, emotions, and other intangible indicia of credibility and sincerity during the testimony

and audio recordings elicited at trial. Kandace's overall demeanor, tone, and emotion was telling. For example, when Kandace called 911, she did not complain of an injury from the tumbler. But during the visit from the police officers resulting from the 911 call, an officer noticed the wound on Kandace's leg, pointed it out to Kandace, and asked if it resulted from the tumbler. Kandace immediately and incredibly stated in ostensible disbelief: "Oh yeah. Didn't even notice that. There's the straw," referring to the smaller, inner circular abrasion on her thigh. The officer asked: "Did that go in your leg?" Kandace responded: "I don't know. I didn't even notice that it happened." Def.'s Ex. 4-1, at 3, 5. Her claim not to have discovered such an intense injury until the police pointed it out is potentially justifiable given the amount of adrenaline she would have had if the tumbler had been thrown at her, but the tone of her shocked reaction to the discovery of the injury sounded resoundingly performative and feigned. In contrast, the police recording of Jeremiah's emotional reaction to the police telling him the charges while he was riding in the police car indicated that he was sincerely perplexed and distraught at how such charges could result from his actions in merely throwing the tumbler at a linen closet. Def.'s Ex. 4-1 at 8.

Further, Kandace had motive to feign an injury and falsify her report. According to Jeremiah, he had previously told Kandace on February 18, 2018 that he would be filing for divorce that week. He then filed divorce on February 21 but had not served Kandace before the incident on February 28 because he thought it would be more appropriate to give her the filing himself rather than having her formally served.

What's more, Megan Sanchez, Jeremiah's ex-girlfriend and mother of his first child, testified that Kandace knew that Jeremiah planned to file or had filed for divorce. Megan testified that Kandace monitored Jeremiah's mail and saw on his credit-card statements that he hired an attorney. She also testified that she and Kandace, together, looked up the divorce filings on the clerk's online filing portal and saw Jeremiah's divorce filing even though Kandace had not been served.

Jeremiah further testified that Kandace was familiar with the difficult custody dispute between him and Megan regarding his first child. According to Jeremiah, Kandace told him that she had learned from Megan's mistake in allowing him to have custody of his first child, and that Kandace would not allow him to have custody of their child. Kandace

8

simply testified that she did not know about the divorce and otherwise did not dispute Megan's or Jeremiah's testimony.[6]

Knowing that their divorce and a custody battle were imminent, Kandace saw an opportunity to obtain an advantage over Jeremiah. For all the above reasons, the Court finds that Kandace fabricated her injury and falsely reported that Jeremiah threw the tumbler at her.

### *1. Initiating or Procuring Prosecution*

The first disputed malicious-prosecution element is whether Kandace initiated or procured the prosecution. The question is not whether Kandace "caused" criminal proceedings, but whether she either "initiated" or "procured" them. *Browning-Ferris Indus., Inc. v. Lieck*, 881 S.W.2d 288, 292–93 (Tex. 1994). The parties agree that initiation does not apply here, as it applies only when the defendant filed formal charges against the plaintiff. *See id.* Here, Kandace did not file formal charges. Thus, the Court must determine whether Kandace "procured" the prosecution. According to the Texas Supreme Court:

> A person procures a criminal prosecution if his actions were enough to cause the prosecution, and but for his actions the prosecution would not have occurred. A person does not procure a criminal prosecution when the decision whether to prosecute is left to the discretion of another, including a law enforcement official or the grand jury, unless the person provides information which he knows is false. A criminal prosecution may be procured by more than one person.

*Id.* at 293. The Ennis County Police and District Attorney—not Kandace—had the discretion whether to charge and prosecute Jeremiah, so Kandace did not procure his prosecution unless she provided information she knew was false, and but for that false information, the prosecution would not have occurred.

Kandace called 911 claiming that Jeremiah threw the metal tumbler at her and her child and then later told the police that she was injured as a result of Jeremiah's actions. Both of those allegations were false.

---

[6] Kandace's attorney did not cross-examine Megan Sanchez.

9

Jeremiah did not throw the tumbler at her, and her injury could not have been caused by Jeremiah throwing the tumbler. Based on those lies, the police charged Jeremiah with aggravated assault and child endangerment. But for these false claims, Jeremiah would not have been charged. Thus, Kandace's actions were enough to cause the prosecution, and but for these actions, the prosecution would not have occurred. Kandace procured Jeremiah's prosecution.

### 2. Innocence

The next disputed malicious-prosecution element is whether Jeremiah is innocent of the charges. Jeremiah was ultimately charged with three offenses: (1) aggravated assault, (2) assault causing bodily injury to a family member, and (3) child endangerment. The mere dismissal of a charge or the failure or refusal to convict is insufficient to find innocence. Jeremiah has proven his innocence by a preponderance of the evidence as to all three of these offenses.

#### a. Aggravated Assault

A person commits aggravated assault if "the person commits assault as defined in Section 22.01 and the person: (1) causes serious bodily injury to another, including the person's spouse; or (2) uses or exhibits a deadly weapon during the commission of the assault." TEX. PENAL CODE § 22.02.[7] A person commits assault under section 22.01 if he or she "(1) intentionally, knowingly, or recklessly causes bodily injury to another, including the person's spouse; or (2) intentionally or knowingly threatens another with imminent bodily injury, including the person's spouse; or (3) intentionally or knowingly causes physical contact with another when the person knows or should reasonably believe that the other will regard the contact as offensive or provocative." *Id.* § 22.01(a).

Jeremiah did not intentionally, knowingly, or recklessly cause bodily injury to Kandace, as he did not throw the tumbler at her, and he did not

---

[7] "Serious bodily injury" means "bodily injury that creates a substantial risk of death or that causes death, serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." *Id.* § 1.07(46). "Deadly weapon" means: "(A) a firearm or anything manifestly designed, made, or adapted for the purpose of inflicting death or serious bodily injury; or (B) anything that in the manner of its use or intended use is capable of causing death or serious bodily injury." *Id.* § 1.07(17).

10

cause her injury. The question is whether Jeremiah's actions in throwing the metal tumbler in Kandace's vicinity but not at her is sufficient to intentionally or knowingly threaten Kandace with imminent bodily injury. The Court finds that his actions are not sufficient. Weighing the testimony of both Jeremiah and Kandace and their credibility, the Court finds that Jeremiah did not intentionally or knowingly threaten Kandace with imminent bodily injury by throwing the tumbler. While the Court does not condone Jeremiah's behavior, the Court finds that he did not knowingly cause injury or intend to cause injury—he was merely acting out in a regrettable display of anger. Thus, Jeremiah proved he is innocent of the aggravated-assault charge by a preponderance of the evidence.

### b. Assault Causing Bodily Injury to a Family Member

The same reasoning applies to the lesser charge of assault causing bodily injury to a family member. A person commits this offense if he "intentionally, knowingly, or recklessly causes bodily injury to another, including the person's spouse." TEX. PENAL CODE § 22.01(a)(1).[8] For the same reasons stated above, the Court finds that Jeremiah did not intentionally, knowingly, or recklessly cause bodily injury to Kandace; therefore, he is innocent of this offense.

---

[8] The culpable mental states are defined in Texas Penal Code section 6.03:

> (a) A person acts intentionally, or with intent, with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result.
>
> (b) A person acts knowingly, or with knowledge, with respect to the nature of his conduct or to circumstances surrounding his conduct when he is aware of the nature of his conduct or that the circumstances exist. A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result.
>
> (c) A person acts recklessly, or is reckless, with respect to circumstances surrounding his conduct or the result of his conduct when he is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint.

11

### c. Child Endangerment

Similarly, Jeremiah could not have committed child endangerment. Although the Ellis County District Attorney declined to prosecute this charge and dismissed it, the Court must determine whether Jeremiah is innocent of this charge for purposes of malicious prosecution. The question is whether Jeremiah's behavior would have resulted in a child-endangerment charge regardless of Kandace's false reporting.

A person commits child endangerment if he "intentionally, knowingly, recklessly, or with criminal negligence, by act or omission, engages in conduct that places a child younger than 15 years in imminent danger of death, bodily injury, or physical or mental impairment." TEX. PENAL CODE § 22.041(c). For many of the same reasons discussed above with respect to the assault charges, the Court also concludes that Jeremiah did not intentionally, knowingly, recklessly, or with criminal negligence place his daughter in imminent danger of death, bodily injury, or physical or mental impairment. Again, Jeremiah did not throw the tumbler at Kandace while she was holding their child. But for Kandace's false report and feigned injury, the police would not have had the bases to charge Jeremiah with child endangerment. Therefore, Jeremiah has shown by a preponderance of the evidence that he is innocent of the child-endangerment charge.

### 3. *Probable Cause to Initiate Prosecution*

The next disputed malicious-prosecution element is probable cause, which examines "whether a reasonable person would believe that a crime had been committed given the facts as the complainant honestly and reasonably believed them to be before the criminal proceedings were instituted." *Kroger Tex. Ltd. P'ship v. Suberu*, 216 S.W.3d 788, 792–93 (Tex. 2006) (citation omitted). There is a presumption that Kandace acted reasonably and had probable cause to initiate criminal proceedings. *Id.* Jeremiah must rebut this presumption with evidence that the motives, grounds, beliefs, or other information upon which Kandace acted did not constitute probable cause. *Id.* at 793. This represents the balance between Kandace's interest in reporting claims that she reasonably believes have been committed against her, and Jeremiah's interest in redress for false accusations that his actions were criminal. *Id.* at 792.

12

Jeremiah has produced sufficient evidence to rebut this presumption. Kandace called 911 falsely claiming that Jeremiah threw the tumbler at her and then later claimed that the tumbler injured her. The evidence shows the opposite: Kandace's injury could not have occurred from Jeremiah throwing the tumbler at her regardless of the force with which, or the angle at which, it was thrown. Moreover, Jeremiah provided evidence that Kandace had motive to accuse him of a crime to obtain an advantage over him in their impending divorce proceedings. She knew that Jeremiah had hired a divorce attorney and likely knew Jeremiah had filed for divorce, even though she had not yet been served. Kandace had motive to exploit Jeremiah's behavior, to give herself an advantage in the couple's imminent divorce and child-custody dispute. Kandace did not have probable cause to report a false statement that Jeremiah threw the tumbler at her; nor did she have probable cause to report a self-inflicted injury as one inflicted by Jeremiah. This self-inflicted injury brings the Court to the malice prong.

### 4. *Malice*

Kandace argues that she did not act with malice and therefore cannot be liable for malicious prosecution. "Malice" is defined as "ill will or evil motive, or such gross indifference or reckless disregard for the rights of others as to amount to a knowing, unreasonable, wanton, and willful act." *Luce v. Interstate Adjusters, Inc.*, 26 S.W.3d 561, 566 (Tex. App.—Dallas 2000, no pet.) (citation omitted). "[I]t is not necessary to prove that the defendant acted with personal spite or ill will; it is sufficient to show the defendant committed wrongful acts in reckless disregard of another's rights and with indifference as to whether the party would be injured." *Id*. Malice may also be inferred from a lack of probable cause. *Id*.

The Court finds that Kandace acted with malice by falsely claiming that Jeremiah threw the tumbler at her and injured her. In fact, Kandace went so far as to manufacture the injury to support her claim and to obtain an advantage over Jeremiah in their looming divorce. Inflicting an injury on oneself under these circumstances can only be borne of ill will or evil motive. Additionally, the Court has already found that Kandace lacked probable cause to procure the prosecution, so malice may also be inferred. Here, malice is clear.

13

### 5. Damages

Jeremiah hired counsel to defend the charges against him, all of which were either rejected for prosecution or dismissed for insufficient evidence. Nevertheless, Jeremiah incurred $40,000 in expenses and legal fees defending himself, in addition to the $1,530 bail bond. But for Kandace's actions, Jeremiah would not have incurred these expenses and fees. And but for Kandace's actions, Jeremiah would not have been wrongfully jailed, even if just for a short time.

In addition, Jeremiah testified that as a result of these charges, his name was listed in the local newspaper for assaulting his wife and that he suffered embarrassment in his community as a local businessman. For example, he believes that the charges cost him his seat on the local chamber-of-commerce board and another community board position. Jeremiah asserts both monetary and nonmonetary injury.

The Court finds by a preponderance of the evidence that Jeremiah has established malicious prosecution against Kandace. While the Court does not award damages for Jeremiah's embarrassment or loss of positions in the community,[9] the Court finds that Kandace owes Jeremiah $40,000 for the fees and expenses he incurred in defending himself from her spurious charges, and $1,530 for his bail-bond payment.

### B. Count II: Exception to Discharge under 11 U.S.C. § 523(a)(6)

Jeremiah argues that the damages that Kandace caused through her malicious prosecution are nondischargeable in Kandace's Chapter 7 bankruptcy case. Section 523(a)(6) excepts from discharge any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity."

Courts in the Fifth Circuit have employed a two-part test to determine willful and malicious injury: an injury is willful and malicious if the plaintiff demonstrates either (1) "an objective substantial certainty of harm;" or (2) "a subjective motive to cause harm." *In re Sligh*, No. 21-30915-SGJ7, 2022 WL 1101537, at *5 (Bankr. N.D. Tex. Apr. 12, 2022) (citing *In re Williams*, 337 F.3d 504, 509 (5th Cir. 2003) and *In re Miller*,

---

[9] Jeremiah did not seek monetary compensation for such damages.

14

156 F.3d 598, 603 (5th Cir. 1998)). The "objective substantial certainty of harm" prong was designed knowing the reality that defendants rarely admit malicious intent. *In re Sligh*, 2022 WL 1101537, at *5. And because a debtor will rarely, if ever, admit to acting with willful and malicious intent, both elements may be inferred from the circumstances of the alleged injury. *Id.*

> An objective substantial certainty of harm is established where the defendant's actions, which from a reasonable person's standpoint were substantially certain to result in harm, are such that the court ought to infer that the debtor's subjective intent was to inflict a willful and malicious injury on the plaintiff. Courts find a subjective motive to cause harm when a defendant acts deliberately and intentionally, in knowing disregard of the rights of another.

*Id.* (citations and internal quotations omitted).

Kandace's actions in falsely reporting a crime and manufacturing an injury were substantially certain to result in injury to Jeremiah, satisfying the objective-substantial-certainty-of-harm prong. Any reasonable person would know full well the emotional and financial harm such actions were substantially certain to cause.

Moreover, because the Court already found that Kandace acted with malicious intent in falsifying allegations against Jeremiah, the Court also finds that Kandace acted with the requisite subjective intent, acting deliberately and in knowing disregard to Jeremiah's rights.

The evidence shows that Kandace caused a willful and malicious injury under section 523(a)(6), rendering nondischargeable Jeremiah's malicious-prosecution claim for attorney's fees and expenses of $40,000 and a bail-bond payment of $1,530.

## IV. Conclusion

For the reasons discussed herein, the Court will award Plaintiff Jeremiah Mikel a nondischargeable claim against Defendant Kandace Michelle Mikel in the amount of—

- $41,530 in damages for malicious prosecution;

- $15,577.77 in damages from the divorce;

- $29,601.67 in damages plus pre and postjudgment interest at the annual rate of five percent, per the Final Divorce Decree; and

- $1,814.41 of child support arrears.

The Court will enter judgment in favor of the Plaintiff.

### End of Findings of Fact and Conclusions of Law ###